UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| TALON CONSTRUCTION SERVICES, LP<br>　　Plaintiff/Counter-Defendant<br><br>v.<br><br>LIGHTING LOGIC, LLC, HARRIS<br>MANUFACTURING, INC., HARRIS LIGHTING,<br>INC. and AMERICAN RECEIVABLE CORP.<br>　　Defendants/Cross-Defendants/<br>　　Counter-Plaintiff/Third-Party Plaintiff<br><br>v.<br><br>JAMES LOGAN,<br>　　Third-Party Defendant | § § § § § § § § § § § § § § § § § | A-05-CA-594-SS |

**RESPONSE TO AMERICAN RECEIVABLE CORPORATION'S MOTION FOR SUMMARY JUDGMENT AGAINST LIGHTING LOGIC, L.L.C., HARRIS MANUFACTURING, INC. AND HARRIS LIGHTING INC.**

TO THE HONORABLE SAM SPARKS:

Defendants Lighting Logic, L.L.C. and Harris Manufacturing, Inc. (collectively "Harris") file this Response to American Receivable Corporation's ("ARC") Motion for Summary (the "MSJ Against Harris"), respectfully requesting that this Court deny ARC's MSJ Against Harris and would show the Court as follows:

## I. INTRODUCTION

1.　ARC's MSJ Against Harris must be denied. There are material questions of fact for each of the causes of action for which ARC seeks summary judgment. Specifically, there are material questions of fact as to whether an agreement ever existed between ARC and Harris, whether Harris made any promises or misrepresentations to ARC, and whether ARC reasonably relied on any of the alleged misrepresentations. Indeed, the facts in this case show that at all times Harris was

Page 1

performing under the subcontract between Harris and Talon (the "Subcontract"), to which any claims by ARC would be subject. These questions of material fact preclude summary judgment against Harris.

## II. FACTUAL BACKGROUND

### A.   The Wal-Mart Lighting Retrofit Project

2.   Harris is in the business of manufacturing and selling energy efficient lighting systems. Harris entered into a series of contracts with Wal-Mart Stores, Incorporated to manufacture, install and/or retrofit the lighting systems at over 2500 stores, including Sam's Club stores, within the Wal-Mart organization all over the United States. (See Ex. A, Deposition of Scott Green (the "Green Depo.") at pp. 20:11-23:20; Ex. B, Deposition of Kim Tisdale (the "Tisdale Depo.") at pp. 11:19-12:14). To accomplish this, Harris employed up to 100 subcontractors to perform the installation and retrofit work. (Ex. A, Green Depo. at pp. 88:14-89:3). Talon Construction Services, L.P. ("Talon") was one of the subcontractors Harris hired to perform such work on 60 stores. (Ex. A, Green Depo. at pp. 38:18-39:11, 88:14-89:3).

3.   After the retrofit work at a particular store was claimed to have been finished, Wal-Mart required a third-party auditor to review the work to determine: (1) if all of the fixtures had in fact been replaced, retrofitted or relamped; (2) if it was done correctly; and (3) to determine if additional work, i.e. punch lists, needed to be done. (Ex. C, Deposition of David Hail (the "Hail Depo.") at pp. 10:22-11:17, 13:8-14:10; Ex. B, Tisdale Depo. at pp. 10:13-15:18). If this work had not been completed or had been performed incorrectly, the auditor would note the items that had to be performed for the store to be considered complete. (*E.g.*, Ex. C, Hail Depo. at pp. 15:3-16:1, 36:18-38:5). Until the third-party auditor had signed off on a store as being complete per Wal-Mart's specifications for the lighting retrofit project, Wal-Mart did not consider the store to be completed.

(Ex. B, Tisdale Depo. at pp. 14:14-15:18).

B.   **Talon's Contractual Agreement with Harris**

4.   At the outset, Harris and Talon entered into a Subcontract Agreement dated February 24, 2004. (Ex. D, Affidavit of Scott Green ("Green Aff."), at Attachment 1). Then, on July 8, 2004 Talon and Harris entered into another Subcontract Agreement that made only minor changes to the February 2004 Subcontract. The contractual relationship between Talon and Harris with regard to the lighting retrofit work was governed by these two contracts. (Ex. D, Green Aff. ¶ 6 & Atts. 1-2). Both the subcontracts required Talon, among other things, to provide quality work, provide invoices and associated documentation in a certain manner and to perform to Harris's satisfaction any punch list items identified by either Harris or Wal-Mart. (Ex. D, Green Aff. at Atts. 1 & 2 ¶¶ 3-5). Importantly, the subcontracts likewise both provide that Talon will defend and hold Harris harmless for its material breach of the Subcontract and provides that upon Talon's default that Talon "shall be liable to reimburse and to pay Logic/Harris for all extra costs and expenses, and for all actual and liquidated damages caused by the SUBCONTRACTOR'S delay and failure to complete the Work and to perform in strict accordance with the provisions of this Subcontract." (Ex. D, Green Aff. at Atts. 1-2 ¶¶ 15, 16B & 19).

C.   **Talon's Agreement With ARC**

5.   At some point, Talon apparently entered into an agreement with ARC.[1] Harris did not know the details of the relationship between ARC and Talon. (Ex. A, Green Depo. at pp. 57:24-58:18, 126:10-127:4; Ex. E, Deposition of Ron Dawson (the "Dawson Depo.") at pp. 19:21-20:2). Rather, Harris was merely sent a letter on Talon letterhead signed by Talon's principal, James

---

[1] According to ARC's pleadings, the agreement between Talon and ARC is attached as Ex. E to ARC's Motion for Summary Judgment and Brief in Support (the "MSJ Against Talon").

Page 3

Logan, indicating that its invoices had been assigned to ARC and directing payment of future invoices to the following address: TALON CONSTRUCTION SERVICES, L.P., C/O AMERICAN RECEIVABLE CORP, P.O. Box 836247, Richardson, Texas 75083-6247. (Ex. F, Letter dated March 3, 2004 from James Logan (the "Notification Letter") [also attached as Ex. I to ARC's MSJ Against Harris]). As Talon requested, Harris representatives signed the Notification Letter on the line labeled "RECEIVED:".

6. Pursuant to Talon's request in the Notification Letter, Harris thereafter sent payments due Talon to the address above. (Ex. A, Green Depo. at pp. 67:13-20, 135:17-138:1). However, Harris never entered into any separate agreement with ARC to make payment to ARC or to not assert or to waive its defenses and rights under the Subcontract with Talon against ARC. (Ex. A, Green Depo. at pp. 65:15-66:23, 135:17-136:3; Ex. D, Green Aff. ¶ 4).

7. Furthermore, Harris did not enter into any agreement with ARC nor make any representations to ARC regarding any "verification procedure" for invoices. (Ex. A, Green Depo. at pp. 65:8-66:23, 68:4-22, 113:4-18, 127:23-130:20; Ex. D, Green Aff. ¶ 4).[2] Even so, ARC would sometimes inquire about the status of invoices that had been submitted by Talon. When Harris responded, ARC was repeatedly warned that payment of the invoices was subject to the terms of Talon's Subcontract. In fact, Mr. Dawson stated more than once regarding invoices for which ARC seeks payment that the invoices were "entering our system for ageing [sic] and payment *per [Talon's] subcontract agreement. As always, these and all invoices are subject to the subcontract agreement.*"(emphasis added). (Exs. G and H, Dawson emails [also attached to ARC's MSJ Against

---

[2] Despite Scott Green's multiple denials of conversations with John Stieber of ARC agreeing to any verification process for invoices, ARC nonetheless claims that "there is no evidence to dispute that Harris discussed the verification procedure with ARC and agreed to communicate its invoice approvals to ARC verbally or by email." MSJ Against Harris at p. 3, n. 12. The refuting evidence to ARC's unfounded assertion in this regard is often found in the testimony immediately after ARC's designation from Mr. Green's deposition. (Ex. A, Green Depo. at pp. 65:3-66:17, 128:23-130:20, 132:6-133:18)

Page 4

Harris as Exs. L and M]). In another instance Ron Dawson likewise informed ARC that "all such notifications are subject to *our contract terms with Talon of course*." (emphasis added) (Ex. I, February 14, 2005 email from Dawson to B. Gurney [included in Ex. S to ARC's MSJ Against Harris]). Despite these repeated reminders that the Subcontract ultimately governed the parties' rights and whether Talon would be paid, ARC neither reviewed the Subcontract nor asked for clarification regarding Mr. Dawson's caveats in his communications regarding the ARC invoices. (Ex. J, Stieber Depo, at pp. 26:6-28:5, 34:10-19).

**C.     Talon's Default on Its Subcontract**

8.      Talon defaulted under the Subcontract in many ways. (Ex. A, Green Depo. at pp. 41:23-43:23, 72:21-74:9, 78:25-80:21, 82:21-83:17, 171:1-172:10, 187:6-188:25). It refused to perform punch lists on numerous stores, and by April 2005, Talon had become completely nonresponsive despite multiple calls by Harris to Talon requesting Talon to complete stores, perform punch lists and perform its duties under the Subcontract. In response to ARC's inquiries regarding payment, Scott Green informed ARC that it was withholding payment pursuant to the Subcontract and specifically enumerated the difficulty Harris was having getting Talon to perform. (Ex. K, Email dated April 27, 2005 to Brad Gurney [included in of Ex. S to ARC's MSJ Against Harris]; Ex. A, Green Depo. at pp 77:25-80:21).

9.      Talon never responded to Harris and refused to finish its work under the Subcontract. As a result, Harris was forced to hire other subcontractors to finish Talon's work. (Ex. A, Green Depo. at pp. 184:10-185:4). These costs along with other valid chargebacks due to unapproved change orders or other faults in Talon's work far exceed the amounts being claimed by Talon and ARC in this lawsuit and are being sought by Harris pursuant to its Subcontract with Talon. (Ex. A, Green Depo. at pp. 187:6-188:25, 184:1-12, 170:24-171:8).

## III. ARGUMENTS AND AUTHORITIES

10.     Summary Judgment must be denied. There is a material question of fact relating to whether any agreement existed between ARC and Harris. Likewise, Harris did not make any promises or misrepresentations to ARC and there is clearly a fact question as to whether ARC reasonably relied on the alleged misrepresentations in this case. As a result, ARC's MSJ Against Harris must be denied.

### A.     No Express Contract Exists Between Harris and ARC[3]

11.     The facts upon which ARC relies for its express and implied contract claims are clearly in dispute. As stated above, Scott Green directly controverts John Stieber's testimony that they discussed and agreed to a "verification procedure" relating to Talon's invoices. (Ex. D, Green Aff. ¶ 4). In fact, Green's testimony could not be more clear:

> Q:    Okay. Did you talk about with anyone from American Receivable how they would be notified–how American Receivable would be notified that an invoice was approved for payment?
>
> A:    *No.* Again, our contracts and our agreements were not with American Receivable, so I would not have been discussing with a third party that I had no contractual relationship with what the terms of the contract were. I would have asked them and said very clearly to them: You need to refer to the cont[r]act, you need to make yourself aware of it . . ..

(emphasis added) (Ex. A, Green Depo. at pp. 65:8-66:17, 68:4-22, 70:20-23, 113:4-22, 128:23-130:20). Clearly, there is controverting evidence to whether the "verification procedure" was discussed and agreed to by Harris. In fact, Harris denies that it occurred.

12.     ARC also points to the Notification Letter as an alleged agreement. It is no such thing.

---

[3] It is important to note that ARC is not claiming rights under the Subcontract but is instead claiming an independent contract between ARC and Harris that was allegedly created out of whole cloth. Furthermore, ARC did not ever make such a claim before this suit. Rather, its communications referenced the Subcontract and never asserted that a contract existed between Harris and ARC. (Ex. L, Emails from Brad Gurney included as part of Ex. S to ARC's MSJ Against Harris; See also Ex. M, apparently unsent email from Brad Gurney [Green Depo. Ex. 2]). It is curious that Mr. Gurney, who participated in ARC's initial communications with Harris (Ex. J., Stieber Depo. at pp. 8:1-10:13) made no reference in these 2005 emails to any agreement or promise made by Harris to ARC.

Rather, the Notification Letter is merely a notice pursuant to the Uniform Commercial Code that Talon's accounts had been sold or assigned to ARC and that payments should be made as directed in the Notification Letter. *See* TEX. BUS. & COM. CODE § 9.406(a). Following receipt of such a notice, Harris was required to (and did) pay any amounts due as directed in the notice. But it is *only the direction* of payments that are affected by such a notice–no contract rights are created.

13.   Texas' version of the Uniform Commercial Code is clear that *unless* Harris has entered into an enforceable agreement not to assert defenses or claims, ARC's rights as assignee are subject to "*all terms of the agreement between [Harris] and [Talon] and any defense or claim in recoupment arising from the transaction that gave rise to the contract.*" TEX. BUS. & COM. CODE § 9.404 (emphasis added). No such agreement was ever made relating to the verification procedure nor was there any agreement regarding a waiver of defenses or rights under the Talon Subcontract. (Ex. A, Green Depo. at pp. 65:8-66:17, 68:4-22; 70:20-23, 113:4-22, 128:23-130:20; Ex. D, Green Aff. at ¶ 4 and Atts. 1-2 ¶¶ 15, 16B & 19) (providing indemnity, recoupment and offset rights).

14.   The Federal District Court for the Northern District of Texas in Dallas was faced with a similar situation in *Compressors Plus, Inc. v. Service Tech D. E Mexico, S.A.*. Cause No. 3-03-CV-1384-R, 2004 U.S. Dist. LEXIS 10336; 54 U.C.C. Rep. Serv. 2d (Callaghan) 50 (N.D. Tex. June 4, 2004), *findings and recommendation adopted*, 2004 U.S. Dist. LEXIS 11515 (N.D. Tex. June 22, 2004). In that case, the defendant was sent a notification letter similar to the one sent to Harris. *Id.* at *4. Unlike the facts of the present case, the defendant was also sent a "letter of acceptance" that the defendant signed stating, "The merchandise is in accordance with the quality and quantity requested and will be paid in full according to the terms specified in the invoice." *Id.* Even with that language, the District Court found that no enforceable agreement was entered into by the defendant to waive its defenses under Section 9.404(a). Instead, the defendant was free to assert

claims despite the fact that the invoices had been previously approved. *Id.* at *9-10.

15. There is likewise no evidence of such a waiver in this case. Indeed, the evidence of such an agreement is even more scant than in *Compressors Plus v. Service Tech*. Mr. Green directly disputes that he ever entered into any such agreement and ARC was repeatedly reminded that payment of invoices was subject to the Subcontract as shown above. (Ex. A, Green Depo. at pp. 65:15-66:23, 135:17-136:3; Ex. D, Green Aff. ¶ 4; Ex. G and H, Dawson emails; Ex. I, February 14, 2005 email from Dawson to Gurney). In sum, the Notification Letter was merely a notice to Harris as to where payments should be sent on Talon's invoices subject to the Subcontract. (Ex. F, Notification Letter) It constitutes nothing more. Summary judgment on ARC's express contract claim must be denied.

**B.     There is Neither an Implied Contract Nor a Basis for Promissory Estoppel**

16. For the same reasons there is not an express contract, there can be no implied contract or promissory estoppel. ARC relies on the same actions by Harris discussed above as evidence of the implied contract and the alleged promise for these claims. ARC's argument is fanciful. ARC cites Harris's payment of Talon's invoices as requested in the Notification Letter (and pursuant to the Uniform Commercial Code) as evidence that Harris entered into a contract with ARC. ARC also relies on the fact that Harris sent emails to ARC stating the payment would be made as evidence of a separate implied agreement outside the Subcontract. As shown above, ARC was repeatedly informed and warned by Harris that such notifications and payments were subject to the Subcontract.[4] (Exs. G and H, Dawson emails; Ex. I, February 14, 2005 email from Dawson to Gurney). Again, no promise or agreement was made. Furthermore, ARC did nothing in response to these warnings. (Ex. J, Stieber Depo. at pp. 26:6-27:11, 27:20-28:5, 34:10-19). Any reliance by

---

[4] ARC makes oblique reference to terms that Talon unilaterally placed on its invoices regarding notification of claims. Harris never agreed to those unilateral terms. Harris's repeated references to the Subcontract is refuting evidence to ARC's claim that Harris accepted those terms.

Page 8

ARC was not reasonable as a result.

17. Even without that completely unheeded warning, ARC was always subject to Harris's rights under the Subcontract pursuant to Section 3.404(a)(1) of the Texas UCC. Because no enforceable agreement was ever entered into by Harris waiving its Subcontract rights, ARC was always faced with the peril of Talon's nonperformance of the Subcontract and Harris's rights thereunder. Summary judgment must be denied on the implied contract and promissory estoppel claims.

### C.   Harris Did Not Make Any Misrepresentations to ARC

18. Finally, ARC's negligent misrepresentation claim suffers the same fate. Again, ARC relies on the same, tired evidence that it relies on for its promissory estoppel and implied contract claims–that Harris sent ARC emails stating that payment would be made on the invoices even though ARC was repeatedly warned that such notifications and payment were subject to the Subcontract. Again, no enforceable agreement waiving Harris's rights under the Subcontract pursuant to Sections 9.404 and 9.403 of the Texas UCC had been entered into by Harris. Harris's approvals were always subject to the Subcontract Agreement.

19. Furthermore, the statements in those emails were not false when they were made and were not made negligently because Harris reasonably believed that Talon would perform its duties under the Subcontract. (Ex. A, Green Depo. at pp. 78:25-80:21, 81:3-24, 132:6-134:6). Once Talon had unexpectedly defaulted, however, Harris seasonably responded to ARC's inquiries by again referring ARC to the Subcontract. (Ex. A, Green Depo. at 77:18-80:9, 94:16-22; Ex. K, Email dated April 27, 2005 to Brad Gurney). In short, the alleged misrepresentations were merely statements that Harris would pay according to the Notification Letter pursuant to the Subcontract. This was not a misrepresentation. If Talon were owed these monies under the Subcontract, Harris would have paid them to Talon in care of ARC. (Ex. A, Green Depo. at 90:11-91:7, 132:15-133:11).

20.     Furthermore, ARC could not have reasonably relied on any of the alleged misrepresentations. After being told that any payment was subject to the Subcontract and that the approvals for payment were subject to the Subcontract, ARC admits it did not review, consult, or even consider the Subcontract's terms. (Ex. J, Stieber Depo. at pp. 26:6-27:11, 27:20-28:5, 34:10-19). There is clearly a fact issue as to whether ARC's actions were reasonable in that regard. Summary Judgment must be denied as to Talon's negligent misrepresentation claim.

### IV. CONCLUSION

21.     ARC's MSJ Against Harris must be denied. Whether or not any agreement or contract was ever entered into between Harris and ARC is hotly disputed. Harris's performance under the Subcontract and the Notification Letter directing payments to be sent to Talon Construction c/o American Receivable Corporation cannot form the basis of any express or implied contract, promise or other agreement. Simply put, ARC's rights are defined and constrained by the Subcontract and are subject to all of Harris's defenses and claims.

WHEREFORE PREMISES CONSIDERED, Defendants Lighting Logic, L.L.C. and Harris Manufacturing, Inc. respectfully request that ARC's Motion for Summary Judgment be denied in all respects, and for all other and further relief to which the Harris Defendants show themselves to be justly entitled.

Respectfully submitted,

FRITZ, BYRNE, HEAD & HARRISON, LLP

By: _____
Rick Harrison
State Bar No. 09120000
Dale L. Roberts
State Bar No. 24001123
98 San Jacinto, Suite 2000
Austin, Texas 78701
Telephone: (512) 476-2020

**Page 10**

Facsimile: (512) 477-5267

ATTORNEYS FOR DEFENDANTS
LIGHTING LOGIC, L.L.C. AND HARRIS
MANUFACTURING, INC.

### CERTIFICATE OF SERVICE

I hereby certify that on March 2nd 2007, a true and correct copy of the foregoing document was served on the following via Electronic Mail by Delivery of Notice of Electronic Filing:

Brian Turner
LAW OFFICE OF BRIAN TURNER
111 Congress, Suite 1000
Austin, Texas 78701

Karen Griffin
Cynthia Uduebor
BAKER BOTTS, LLP
2001 Ross Avenue
Dallas, TX 75201

Rick Harrison