IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
MAR 19 2007
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____ DEPUTY CLERK

TALON CONSTRUCTION SERVICES, LP,
Plaintiff,

-vs-

Case No. A-05-CA-594-SS

LIGHTING LOGIC, LLC, HARRIS
MANUFACTURING, INC., HARRIS LIGHTING,
INC., and AMERICA RECEIVABLE CORP.,
Defendants.

## ORDER

BE IT REMEMBERED on the 16th day of March 2007 the Court reviewed the file in the above-styled cause, specifically American Receivable Corp.'s Motion for Summary Judgment Against Talon Construction Services, L.C. and James Logan [#68] and the response thereto [#73], American Receivable Corp.'s Motion for Summary Judgment Against Lighting Logic L.L.C., Harris Manufacturing, Inc. and Harris Lighting, Inc. [#69], American Receivable Corp.'s Supplement thereto [#75], Defendants' Response thereto [#72], and American Receivable Corp.'s Reply [#76]. Having reviewed these documents, the applicable law, and the case file as a whole, the Court now enters the following opinion and orders.

### Background

Defendants Lighting, Logic, L.L.C., Harris Manufacturing, Inc., and Harris Lighting, Inc. (collectively, "Harris") entered into a series of contracts with Wal-Mart Stores, Inc. to manufacture, install, and/or retrofit the lighting systems at over 2500 Wal-Mart owned stores. Harris employed

Talon as a subcontractor to perform installation and retrofit work on 60 of these stores. The terms of the Subcontract Agreement provide, among other things:

> §4.B: SUBCONTRACTOR will promptly perform any punch list items identified by LOGIC/HARRIS and/or its customer. If SUBCONTRACTOR has not completed to LOGIC/HARRIS's satisfaction all punch list items within 10 calendar days from the date of notice, the SUBCONTRACTOR shall be in default hereunder and will forfeit any Subcontract amounts still due to SUBCONTRACTOR (retainage) and be liable to LOGIC/HARRIS for any and all costs and expenses LOGIC/HARRIS incurs in completing the punch list items.
>
> §5A. . . . Payment will be made within 30 days of receipt by LOGIC/HARRIS of complete documentation as per LOGIC/HARRIS's policies and procedures. . . .
>
> §8A. This Subcontract may not be subcontracted by SUBCONTRACTOR without the prior written consent of LOGIC/HARRIS.
>
> §8B. If at any time it is discovered that the SUBCONTRACTOR has subcontracted any portion of this Subcontract, then LOGIC/HARRIS will have the right to cancel the subcontract and SUBCONTRACTOR relinquishes all rights to invoice LOGIC/HARRIS for any work performed by any other party.
>
> §8C. Nothing contained in any said subcontract shall create any contractual relationship between LOGIC/HARRIS and SUBCONTRACTOR to pay or see to the payment of any sums to any said subcontractor or Sub-Contractor of SUBCONTRACTOR.

Harris's Resp. Mot. Summ. J. Ex. D.

Under the terms of this subcontract, Talon would perform the work on a store, then submit an invoice to Harris. Logan Dep. 205:22– 206:1, Mot. Summ. J. [#69] Ex. C. Harris then checked the invoice internally, and either approved the invoice for payment or notified Talon that the invoice was not approved. Green Dep. 29:22–33:21.

In order to maintain its cash flow during this approval process (which, under §5A, could take up to 30 days from Harris' receipt of the invoices), Talon entered into a factoring agreement with American Receivable Corporation (ARC) on March 3, 2004. Purchase and Security Agreement,

Mot. Summ. J. [68], Ex. E. This agreement specifically defined the relationship between Talon and ARC as "that of Purchaser and Seller of Accounts." *Id.* at ¶ 5.04. Under the terms of the Talon-ARC Purchase and Security Agreement ("Purchase Agreement"), Talon agreed to offer "each, every, and all" of its accounts receivable to ARC for purchase "as absolute owner, with full recourse." *Id.* at ¶ 2.01. For its part, ARC agreed to purchase "all Accounts that it determines, in its sole discretion, to be an Eligible Account." *Id.* at ¶ 2.03. The term "Eligible Account" is simply defined as "an Account which is acceptable for purchase as determined by Purchaser in its sole discretion or judgment." *Id.* at ¶ 1.01.

The Purchase Agreement holds Talon liable to ARC for any unpaid balance on a Purchased Account. *Id.* at ¶ 6.02. In support of this obligation, the Purchase Agreement allows ARC to create and maintain a "Reserve Account" withheld out of payments otherwise due Talon, in order to "provide for ... defenses to payment or refusals to pay Purchaser for any Purchased Account on the part of the Account Debtor." *Id.* at ¶ 3.01. The Purchase Agreement further grants ARC a security interest in essentially all of Talon's property as collateral: all accounts receivable (whether purchased under the Agreement or not); all inventory, equipment, and fixtures, including replacements and additions thereto; all deposits, savings, and bank accounts; all investment property; all records and software; and all proceeds of the foregoing. *Id.* at ¶¶ 1.01, 5.01, 5.02. Finally, under the Purchase Agreement, Talon is obligated to "repurchase" any disputed account at ARC's request. *Id.* at ¶¶ 7.05, 7.06. Finally, the Purchase Agreement makes Talon liable for reasonable attorneys' fees incurred in enforcing the Purchase Agreement. *Id.* at ¶ 15.01.

ARC entered into a related Individual Guaranty Agreement (the "Guaranty Agreement") with James Logan, the Executive Manager of Talon. Mot. Summ. J. [#68] Ex. F. The Guaranty

Agreement makes Logan personally liable for any unpaid obligations of Talon under the Purchase Agreement. *Id.* at ¶ 2. Logan is also personally liable for ARC's reasonable attorneys' fees incurred in enforcing both the Purchase Agreement and the Guaranty. *Id.* at ¶ 11. This personal liability is "absolute, direct, immediate, and unconditional," *id.* at ¶ 4, and ARC has the right to proceed directly against Logan "without proceeding against or exhausting any other remedies which it might have against Seller [Talon]." *Id.* at ¶ 10.

None of the Harris entities were party to the Talon-ARC purchase agreement or the Guaranty Agreement. Talon did not seek prior written approval from Harris to enter into the agreements with ARC. After signing the Purchase Agreement, Talon notified Harris that Talon had "entered into a financing agreement" with ARC and "in doing so, we have assigned our invoices to American Receivable Corporation, including those of your company." Correspondence of March 3, 2006, Mot. Summ. J. [#69] Ex. I. Talon instructed Harris to direct "all current and future payments" to ARC until otherwise notified by ARC. *Id.* Talon requested that Harris "sign this acknowledgement below and fax back to American Receivable Corporation," which Harris's representative did on March 9, 2004. *Id.*

ARC wished to buy only invoices that were "good, due, and payable." Steiber Dep, 29:5–29:6, Mot. Summ. J. [#69] Ex. E. To that end, ARC's president, Jack Steiber, called Harris's CEO, Scott Green, and requested that Harris send ARC "information stating that the work was done by e-mail as well as verbally." *Id.* at . 8:1–10:11. Green maintains that, in this conversation with Steiber, he made it clear that "we don't contract with factoring companies, we don't have any contracts with factoring companies. That is between you and the other party, and you need to get our contract and read it, and we're not signing any contract." Green Dep., 65:15–65:24, Resp. Summ. J. [72] Ex. A.

Green denies agreeing to any notification or verification procedure with Steiber or any other representative of ARC. *Id.* at 68:4–70:23.

Nevertheless, Steiber maintains Harris made a practice of sending ARC emails stating that each invoice was "approved." Steiber Dep, 29:9–29:13, Mot. Summ. J. [#69] Ex. E. ARC has an email from Harris noting that each of the four invoices at issue in this lawsuit is "approved." Mot. Summ. J. [#69] Ex. K, L, M, N. Two of these emails specifically note that, "as always, these and all invoices are subject to the subcontract agreement." See, e.g., February 17, 2005 email, Ex. L; March 1, 2005 email, Ex. M. Another email, dated February 14, 2005, specifically notes that all approvals and notifications "are subject to our contract terms with Talon of course." Resp. [#72] Ex. I. ARC maintains this disclaimer was first added in February 2005, almost a year after the factoring agreement began. Reply Br [#76], n.14.

Perhaps not coincidentally, the relationship between Talon and Harris began to deteriorate in "mid-2005." Harris' Third Amended Answer and Counterclaim ¶30. As a result, in April 2005 Harris notified ARC that Harris would "be forced to continue forward in accordance with the provisions agreed to in our contracts with Talon." Email of April 27, 2005, Mot. Summ. J. [# 69] Ex. S. Harris subsequently refused payment on several previously "approved" invoices.

Talon sued Harris to recover payment for these approved invoices, joining ARC as a necessary party. ARC subsequently made a counterclaim and a crossclaim, seeking payment of the invoices from Talon, Logan, and Harris. ARC now moves for summary judgment on its claims against Talon, Logan, and Harris, respectively.

## Analysis

### I. Summary Judgment Standard

Summary judgment may be granted if the moving party shows there is no genuine issue of material fact, and it is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In deciding summary judgment, the Court construes all facts and inferences in the light most favorable to the nonmoving party. *Richter v. Merchs. Fast Motor Lines, Inc.*, 83 F.3d 96, 98 (5th Cir. 1996). The standard for determining whether to grant summary judgment "is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the nonmoving party based upon the record evidence before the court." *James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990).

Both parties bear burdens of production in the summary judgment process. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). First, the moving party has the initial burden of showing there is no genuine issue of any material fact and judgment should be entered as a matter of law. FED. R. CIV. P. 56(c); *Celotex*, 477 U.S. at 322–23; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The nonmoving party must then come forward with competent evidentiary materials establishing a genuine fact issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Anderson*, 477 U.S. at 256–57; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). However, "[n]either 'conclusory allegations' nor 'unsubstantiated assertions' will satisfy the non-movant's burden." *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996).

## II. ARC's Claims Against Talon and Logan

ARC's claims against Talon and Logan are essentially undisputed. Defendants admit the existence of both contracts and do not argue that any term of the contracts is susceptible to a different interpretation than that urged by ARC. Talon and Logan merely assert that the amount of attorney's fees owing under their contractual agreements is a question of fact. They do not, however, seek to avoid their contractual liability for attorney's fees. With regard to attorney's fees, ARC's motion for summary judgment against Talon and Logan does not claim a specific amount; it merely seeks to establish the defendants' contractual liability for attorney's fees. Accordingly, ARC's motion for summary judgment against Talon and Logan is granted. The parties shall separately brief the issue of what amount of attorneys' fees is reasonable under the circumstances.

## III. ARC's Claims Against Harris

ARC seeks summary judgment on its claims against Harris for breach of contract, promissory estoppel, and negligent misrepresentation. Essentially, ARC argues that by signing the notification faxed by Talon and agreeing to email approvals of Talon invoices to ARC, Harris entered into a contract with ARC, separate from its contract with Talon, in which Harris agreed to pay ARC for the approved invoices regardless of any offsets or defenses to payment it might assert against Talon. In the alternative, ARC argues Harris' course of conduct implied such an agreement, and ARC justifiably relied on that understanding in purchasing Talon's approved invoices.

### A. Breach of Contract

In order to establish a breach of contract under Texas law, ARC must prove (1) the existence of a valid contract, (2) that ARC performed its obligations under the contract, (3) that Harris breached its obligations under the contract, and (4) that ARC was damaged as a result. *Harris v. Am.*

*Prot. Ins. Co.*, 158 S.W.3d 614, 622–23 (Tex. App.— Fort Worth 2005, no pet.). ARC is not entitled to summary judgment on its breach of contract claim because it has failed to prove the existence of a valid contract between ARC and Harris.

The elements of written and oral contracts are the same and must be present for a contract to be binding. *Bank of El Paso v. T.O. Stanley Boot Co.*, 809 S.W.2d 279, 284 (Tex. App.— El Paso 1991), aff'd in part, rev'd in part on other grounds, 847 S.W.2d 218 (Tex. 1992). The following elements are required for the formation of a binding contract: (1) an offer, (2) acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Labor Ready Cent. III, L.P. v. Gonzalez*, 64 S.W.3d 519, 522 (Tex. App.— Corpus Christi 2001, no pet.); *Komet v. Graves*, 40 S.W.3d 596, 600 (Tex. App.— San Antonio 2001, no pet.).

An implied-in-fact contract "arises from the acts and conduct of the parties, it being implied from the facts and circumstances that there was a mutual intention to contract." *Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609 (Tex. 1972). A meeting of the minds is an essential element of an implied-in-fact contract. *Texas Ass'n of Counties County Gov't Risk Mgmt. Pool v. Matagorda County*, 52 S.W.3d 128, 133 (Tex. 2000). In an express contract, mutual agreement is expressly stated; in an implied contract, mutual agreement must be inferred from the circumstances of the transaction. *Buxani v. Nussbaum*, 940 S.W.2d 350, 352 (Tex. App. — San Antonio 1997, no writ); *T.O. Stanley Boot Co.*, 809 S.W.2d at 284.

The determination of a meeting of the minds, and thus offer and acceptance, is based on the objective standard of what the parties said and did, and not on their subjective state of mind. *Adams v. H & H Meat Prods., Inc.*, 41 S.W.3d 762, 771 (Tex. App.— Corpus Christi 2001, no pet.);

*Angelou v. African Overseas Union*, 33 S.W.3d 269, 278 (Tex. App.— Houston [14th Dist.] 2000, no pet.). In determining mutual assent, the court considers the communications between the parties and the acts and circumstances surrounding those communications. *Komet*, 40 S.W.3d at 601; *Angelou*, 33 S.W.3d at 278.

Here, the communications between ARC and Harris and the surrounding circumstances undisputedly include the following: (1) ARC entered into a factoring agreement and guaranty with Talon and Talon's executive, Logan, that included several forms of recourse against Talon and Logan for disputed accounts. (2) Harris was not a party to the factoring agreement or guaranty, nor did Harris give advance approval of either agreement. (3) Harris signed a notification letter on March 9, 2004 at Talon's request, agreeing to send all payments owed Talon to ARC. (4) ARC asked Harris to email verification that invoices had been accepted for payment. (5) Harris emailed approvals and paid all approved invoices purchased by ARC in 2004. (6) With regard to the four disputed invoices (due in January, February, and March of 2005), Harris emailed ARC notification that each had been accepted for payment. (7) Two of those email notifications also contained disclaimers that all payments (not just the payments referenced in that particular email) were subject to the terms of Harris' agreement with Talon. (8) Harris stated to ARC in a separate email, dated February 14, 2005, that all payments, "as always" were subject to the terms of the Harris-Talon agreement. (5) In April of 2005, after several email communications from ARC asking about approved invoices that had not yet been paid, Harris notified ARC that Talon was in breach of the subcontract agreement and Harris was withholding payment according to its rights under that agreement.

What is notably absent from these facts is any evidence that Harris agreed to create rights in ARC independent of Talon's right to payment. In signing the March 9, 2004 acknowledgement form, Harris agreed to make all payments *owed to Talon* to ARC. The acknowledgment form (created by Talon, not ARC) said nothing about altering or waiving any of Harris's defenses to payment under the Subcontract Agreement. The acknowledgement form merely notified Harris that Talon had assigned its right to payment under the Subcontract to ARC.

> Under Texas law,
>
> unless an account debtor has made an enforceable agreement not to assert defenses or claims . . ., the rights of an assignee are subject to:
>
> (1) all terms of the agreement between the account debtor and assignor and any defense or claim in recoupment arising from the transaction that gave rise to the contract;

TEX. BUS. & COMM. CODE ANN. § 9.404(a) (Vernon 2002). An "enforceable agreement not to assert defenses" is an agreement between the account debtor (Harris) and the assignor (Talon) not to assert defenses to payment against the assignee (ARC). *Id.* at §903(b). It is enforceable by the assignee if he takes the assignment for value, in good faith, and without notice of a defense or claim in recoupment. *Id.* There is no evidence of such an agreement between Harris and Talon in these facts. Moreover, ARC's Purchase Agreement with Talon contains multiple provisions regarding Talon's obligations to cover losses associated with disputed account payments (for example, the "Reserve Account" clause in paragraph 3.01 and the repurchase obligations in paragraphs 7.05–7.06 ). These provisions show that ARC did not purchase the assignment without notice of Harris's defenses to payment. Therefore, under § 9.404(a), ARC's rights as an assignee are subject to the terms,

defenses, and claims in recoupment established by the Subcontract Agreement between Harris and Talon.

ARC had not shown that Harris entered into any further agreement with ARC granting it substantive rights beyond its rights as Talon's assignee. ARC claims Harris entered into an oral agreement to email approval of invoices to ARC so that ARC could rely on that approval to purchase only "good" invoices. Though Harris did email notices of approval to ARC, Harris vehemently contests ARC's characterization of this practice as any separate agreement to pay or guaranty of payment over and above Harris's obligation to Talon. As a matter of law, Harris's emailed approvals are insufficient to establish an oral contract between Harris and ARC to pay the amounts approved regardless of Harris's defenses to payment or claims in recoupment under the Subcontract Agreement.

First, it is axiomatic that a contract requires consideration. *Sanders v. Casa View Baptist Church*, 898 F. Supp. 1169, 1182 (N.D. Tex. 1995). ARC can point to no bargained-for value it offered Harris in exchange for Harris's alleged promise to pay the invoiced amounts to ARC regardless of any defenses or claims in recoupment available under the Subcontract Agreement. ARC asserts Harris made this promise in exchange for Talon's continued work on the Wal-Mart project. Talon, however, already owed Harris the obligation to complete its work under the Subcontract Agreement. That obligation was not in any way legally dependent on Harris paying money to ARC. ARC's right to payment was contingent on Talon's work for Harris, but Talon's obligation to work for Harris was not contingent on Harris's payments to ARC (except insofar as those payments represented money owed Talon).

Second, if Harris had made an agreement to pay the approved amounts to ARC regardless of whether Harris actually ultimately owed those amounts to Talon, Harris would essentially have agreed to act as a guarantor of Talon's financing agreement with ARC— just as Talon's Executive Manager, Logan, did. Such an agreement must be in writing. *First Union Nat'l Bank v. Ekuban (In re Ekuban)*, 177 Fed. Appx. 407, 409 (5th Cir. 2006) (citing *Cohen v. McCutchin*, 565 S.W.2d 230, 232 (Tex. 1978). It is true that "[a] contract by the assignor of a right that the obligor of the assigned right will perform his duty is not within the Statute of Frauds as a contract to answer for the duty of another." REST. 2D. CONTRACTS §121 (1981). ARC, however, is not trying to establish that Harris is obligated to perform its duty under the terms of its contract with Talon. ARC is trying to establish an independent duty on Harris's part to pay all the money ARC loaned Talon when ARC purchased the Subcontract invoices from Talon, regardless of whether Talon actually performed on the Subcontract. Thus, ARC is alleging Harris agreed to act as a guarantor of ARC's financing of Talon. There is, however, no record of a written agreement "manifest[ing] [the] intent to guaranty the obligation," and therefore there can be no contract obligating Harris to absorb ARC's losses in this situation. *Material P'Ships v. Ventura*, 102 S.W.3d 252, 261 (Tex. App. 2003).

Whether Harris properly withheld payment under the terms of its agreement with Talon is an open question, but it is not relevant to ARC's motion for summary judgment. ARC seeks to prove it had a right to payment of the approved invoices based on an agreement between ARC and Harris. No such agreement exists, except insofar as Harris acknowledged ARC's right to payment as Talon's assignee. ARC's right to payment from Harris derives solely from ARC's position as Talon's assignee.

ARC has not shown that Harris ever represented it would forego any defenses to payment it might have against Talon. On the contrary, Harris reminded ARC in writing on at least three separate occasions that ARC's right to payment was subject to the terms of Harris' agreement with Talon. ARC alleges Harris did not assert its right to rely on the terms of the subcontract until almost a year after the initial assignment, but this fact is irrelevant. The limits of ARC's rights as an assignee are circumscribed by § 9.404(a), as discussed above, regardless of whether Harris explicitly reminded ARC of that fact at all.

ARC asserts it had an agreement with Harris which limited the defenses to payment available under the Harris-Talon Subcontract Agreement. In support of this argument, ARC points to a notification on each invoice which states: "This account has been sold, assigned, and is payable at Dallas, Texas to [ARC]. . . . [ARC] must be given notification of any claims, agreements, or merchandise returns that would effect the payment of all or part of this invoice on the due date." Invoices, Mot. Summ. J. [#69] Ex. H. ARC contends that by "approving" these invoices, Harris agreed to assert any defenses to payment on or before the day payment was due on each approved invoice.

Once again, however, ARC fails to identify any consideration for such an agreement. Harris was obligated to pay Talon for services rendered and was obligated to send Talon's payments to ARC as Talon's assignee. That assignment created no further obligation towards ARC, and ARC cannot point to any further benefit offered in exchange for Harris's alleged agreement to limit its defenses to payment. The language printed on each invoice is properly understood as further notification that the right to payment had been assigned, and that the assignee should be notified of any defenses to payment, but this notification cannot operate to modify the terms of the Subcontract

Agreement, particularly where Harris explicitly maintained that the Subcontract Agreement continued to govern the assigned payments. ARC took the payments subject to Talon's agreement with Harris and any defenses to payment therein. Though ARC is entitled to any payments owed to Talon, ARC's unilateral attempt to create an independent right to payment is ineffective.

## B. Promissory Estoppel

To recover on a theory of promissory estoppel, ARC must show "(1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment." *Henry Schein v. Stromboe*, 102 S.W.3d 675, 686 n.25 (Tex. 2002). ARC asserts Harris promised to pay the amounts owed on approved invoices, and knew that ARC would justifiably rely on that promise to pay when it purchased the invoices from Talon. ARC mischaracterizes the promise made by Harris.

Harris never made any unconditional promise to pay the invoiced amounts. Harris promised to pay the invoiced amounts *owed Talon under the terms of the Subcontract*. Talon's assignment of the invoices to ARC does not change the terms of payment or otherwise limit Harris's defenses to payment. TEX. BUS. & COMM. CODE ANN. § 9.404(a). As discussed above, the parties never entered into any agreement altering Harris's rights or defenses to payment under the Subcontract. Furthermore, Harris specifically told ARC that the terms of the Subcontract governed its right to payment on Talon's assigned invoices. To the extent ARC relied on a perceived unconditional promise by Harris to pay approved invoices regardless of any defenses to payment available under the Subcontract, such reliance was not justified in light of the statute and Harris's explicit representations to the contrary.

C. **Negligent Misrepresentation**

To establish negligent misrepresentation, ARC must show that Harris (1) in the course of its business (2) supplied false information for the guidance of others in their business transactions, (3) failed to exercise reasonable care or competence in obtaining or communicating the information, and (4) those others suffered pecuniary loss as a result of their justifiable reliance upon the information. *Richter, S.A. v. Bank of America Nat'l Trust & Sav. Ass'n*, 939 F.2d 1176, 1185 (5th Cir. 1991). ARC has failed to show either a misrepresentation or justifiable reliance. As discussed above, there is no evidence showing Harris ever stated or implied that it waived its defenses under the Subcontract Agreement or made any unconditional promise to pay ARC independent of Talon's right to payment. To the extent ARC perceived any such representation, its reliance thereon was unjustified in light of TEX. BUS. & COMM. CODE ANN. § 9.404(a) and Harris' explicit statements that the Subcontract Agreement governed ARC's assigned right to payment.

## Conclusion

In accordance with the foregoing,

IT IS ORDERED that ARC's Motion for Summary Judgment Against Talon Construction Services, LP, and James Logan [#68] is GRANTED.

IT IS FURTHER ORDERED that ARC's Motion for Summary Judgment Against Lighting Logic, LLC, Harris Manufacturing, Inc., and Harris Lighting, Inc. is DENIED.

SIGNED this the 16th day of March 2007.

SAM SPARKS
UNITED STATES DISTRICT JUDGE